KAREN L. LOEFFLER
United States Attorney

STEVEN E. SKROCKI
STEPHEN COOPER
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Tel: (907) 271-5071
Fax: (907) 271-1500
E-mail: steven.skrocki@usdoj.gov
        stephen.cooper@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:07-cr-00111-RRB-JDR |
| | ) | |
| Plaintiff, | ) | MOTION OF THE UNITED |
| | ) | STATES, IN LIMINE, TO |
| vs. | ) | INVALIDATE SPOUSAL |
| | ) | TESTIMONIAL PRIVILEGE |
| JOSHUA ALAN WADE, | ) | AND SPOUSAL |
| | ) | COMMUNICATION PRIVILEGE |
| Defendant. | ) | AT TRIAL ON BASIS OF |
| | ) | ILLEGAL MARRIAGE |
| | ) | |

The United States files with the court *in limine* a motion seeking a pretrial

ruling on the admissibility of the testimony of Lisa Andrews.  This motion is made

on the grounds that Ms. Andrews purported marriage to Joshua Wade was invalid

under Alaska law and so insufficient to permit invocation of either the spousal or

marital communication privileges.  As demonstrated below, the putative marriage did not meet the requirements of Alaska law.  Further, it did not comport with any of the required procedures set forth by Alaska Department of Corrections for inmate marriages.  Thus, the government seeks a pretrial ruling that neither privilege may be invoked to preclude relevant testimony in this case.

I.   LISA ANDREWS HAS TESTIMONY RELEVANT TO THE ISSUES AT TRIAL

After the investigation into the murder of Mindy Schloss began to focus on Joshua Wade, law enforcement contacted Wade's friends and associates.  This led them to Lisa Andrews who was Wade's on again/off again girlfriend.  Andrews was interviewed by law enforcement officers on August 29, 2007, two weeks prior to the discovery of Schloss' body.  In that interview, she identified Wade as the person shown in one of the ATM photos.  At that interview, and in subsequent statements, she also provided other information relevant to the investigation, some of which came from her own personal observations, but much of which involves conversations with Wade both before and after his arrest and between and after their marriage.

Prior to the first interview, Andrews had a stormy and violent relationship with Wade.  In 2005 and February 2007, Andrews applied for and received

domestic violence restraining orders against Wade.  After obtaining the second

order, Ms. Andrews withdrew her request for a second order, citing separation

between the parties.  According to Ms. Andrews, the two then continued to

cohabit on and off until June 5, 2007, when she evicted Wade from her residence.

## II.   WADE AND ANDREWS ENGAGED IN AN INVALID MARRIAGE CEREMONY

### A.   Facts

1.   The Illegal Marriage Ceremony – January, 2008

On November 1, 2007, after two months incarceration, and through counsel,

Wade gave written notice to the United States Marshal of his intent to marry

Andrews.  In the letter, Wade's former counsel, Assistant Federal Public Defender

Mary Geddes, wrote:

> *I understand the procedure is as follows: you will immediately forward this letter to the United States Attorney's Office. (You will see that I have sent a copy of this letter to Assistant United States Attorneys Bradley and Randell.) The United States Attorney's Office will determine if there is any case-related reason this marriage cannot proceed.  Once that determination is made you will provide me with documentation of that, so I can provide it to the State DOC which will be attached to Mr. Wade's application.*

See Exhibit 1.

The next day, on November 2, 2007, the United States Attorney's Office

responded to the U.S. Marshal, objecting to Wade's request.  In support of the

opposition, the government attached a copy of Andrew's interview.  (See

Exhibit 2).  In making its objection, the government stated as follows:

> *The government opposes this request.  Ms. Andrews is a witness and a material witness, in one of the pending criminal trials against Mr. Wade, to wit: Bank Fraud and Fraud with Access Device (credit card) case bearing the number 3:07-cr-00111-RRB. In this case, it is alleged that Mr. Wade used a ATM/debit card belonging to some other person without authorization.  At the moment of one of the two cash withdrawals with this card, a camera caught and preserved pictures of the perpetrator. Ms. Andrews, when interviewed by the police on August 29, 2007, twenty four days following the withdrawal, positively identified Mr. Wade as the person making the withdrawal.  See attached transcript, pgs. 2 & 3.*
> *In addition, there is evidence, supplied by Ms. Andrews, that this proposal is contrived.  In the same transcript, Ms. Andrews characterized Mr. Wade as an "ass hole, liar, fake." Transcript, pg. 4. Andrews also revealed that she "packed his shit and told him to get out on June 5th. Transcript pg. 3.  These revelations by Ms. Andrews call into serious question the actual motivation for the proposed nuptials.*

(Exhibit 2).

The government's correspondence was copied and provided to counsel for

Wade, Federal Public Defender Mary Geddes.  As of this writing, it is unknown if

counsel ever provided the government's objection to the "State DOC" (State of Alaska, Department of Corrections) as an attachment to Wade's application.[1]

To the government's knowledge, no State DOC application was ever completed for submission to the State Department of Corrections.  It is clear though, by her letter to the U.S. Marshal, that Wade's counsel knew that any marriage required State DOC approval.[2]

The government is in possession of and has reviewed a large number of recorded phone calls between Wade and Andrews that occurred from the time of his arrest until the time of their putative marriage, including the abbreviated attempt at a solemnization itself.  (See Exhibits 3-9, specific recorded conversations between Wade and Andrews concerning their marriage plans).  In the period between his incarceration in early September, 2007, and the purported marriage ceremony at the end of February, 2008, Wade was in phone contact with Andrews as often as incarceration procedures allowed, oftentimes several times

---

[1] The answer to that question is important.  If the objection was attached, and Wade's application denied, it provides motive for the illegal ceremony wherein Wade appeared telephonically.  Either way, State DOC has no record of an application made by Wade.  See Exhibit 11.

[2] In the government's view, Wade was aware given the end-around he took to get married.  Indeed, no inmate can marry validly without satisfying a plethora of conditions imposed by the DOC.  See Exhibit 10.

daily.  The bulk of these conversations reflect angry, hostile, crude, and abusive exchanges between Wade and Andrews, with each suspiciously claiming, *inter alia*, the other as being unfaithful.  During one of these conversations Andrews informs Wade that she is looking "into countries that don't allow extradition" and is afraid of testifying as she "will get beat up by the lawyers and I won't have any integrity."

As established in the conversations provided to the court, Wade and Andrews discuss the following:

Exhibit 3: Wade discusses with Andrews his knowledge that the prosecution objected to his marriage application and the two discuss that the matter was a dead issue.

Exhibit 4: Wade and Andrews discuss the marriage and how to accomplish it.  Wade tells Andrews he is going to have something worked out.

Exhibit 5: Andrews speaks with Wade about the pending marriage and states he doesn't want anyone to get wind of the plans and stop it.  Andrews also advises Wade not to speak to anyone about it so nobody steps in to stop it.  Andrews states, in words to the effect of, "I really don't want people stepping in.  Gives people less reaction time."

Exhibit 6 (Filed Under Seal): Wade pushes Andrews to hurry and proceed with the ceremony with the utmost dispatch.  Andrews tells Wade they will do the ceremony over the phone, stating that, "it doesn't say you have to be there."  In a subsequent conversation Wade discusses with Andrews the knowledge of having to go through the jail to get married, and that they don't have to go through with that procedure.  In conversation 10b Andrews expressed concerns about being charged with obstruction of justice by marrying Wade as she is a witness against him.  Wade ignores her concerns and wants her to proceed with the ceremony.[3]

Exhibit 7: Wade tells Andrews they have to "discredit" her statement to the police.  (Presumably meaning the statement where she identified him in the ATM photo.)  Andrews also relays her concern about testifying.

Exhibit 8: Andrews and Wade discuss the marriage privilege but that they are willing to write a statement to the U.S. Attorney that they (Wade and Andrews) both agree Andrews can testify if subpoenaed.  Andrews asks what if the U.S. Attorney doesn't agree with the marriage.  Wade states, "it will be too late," as they will be married.

---

[3] Exhibit 6 is filed under seal, as Andrews relays to Wade conversations she had with Wade's counsel.

Exhibit 9: The marriage ceremony done with Wade calling into a cell phone from the Anchorage Jail.

As the would-be marriage date gets closer, Wade, who is well aware that the conversations are being recorded and/or monitored, states that the impending marriage is not being performed to keep her from testifying. Wade states, alternatively, that they (Wade and Andrews) are willing to file a notice to the court confirming their willingness to waive any spousal privileges and have Andrews testify during the trial. Said notice has yet to be filed.[4]

Finally, in January, 2008, Andrews, witnesses and others arrived at the Anchorage Jail in order to conduct a marriage ceremony. However, Anchorage Jail rules allowed a maximum of three visitors at any given time. Inasmuch as Alaska law required the presence of two witnesses (none of whom could be a participant) and a Commissioner, the party was turned away.[5] Later that same

---

[4] Prior to each conversation, the participants are advised by recorded message that the call is subject to monitoring and recording. Additionally, there are banner warnings placed on the walls of the phone areas advising that the calls are subject to monitoring and recording. Finally, no letter or filing has been made advising the United States that the spousal testimonial or marital communication privilege has been or will be waived by Wade and/or Andrews.

[5] The "Commissioner" in this case was a cook from *Denny's* where Lisa Andrews was employed. To the government's knowledge, this individual agreed to act as a one-time Commissioner as a favor to Lisa Andrews.

evening, Wade telephoned the wedding party from the Anchorage Jail and participated in the ceremony telephonically.

As of this writing, Lisa Andrews has not met nor spoken with Wade since November, 2008. At that time she terminated her relationship with Wade, but has yet to file for divorce.

### B. The Telephonic Marriage of Wade and Andrews is Invalid Under Alaska Law

The assertion of any marital privilege depends on the existence of a valid marriage, as determined by the law of the State of Alaska. United States v. Lustig, 555 F.2d 737, 747 (9th Cir. 1977) (en banc) (citations omitted). In this case, Wade's putative marriage to Andrews was invalid as it did not meet the requirement of marriage "in the presence" of the witnesses.

### C. The Marriage Is Void Under Alaska Law As It Was Not Properly Solemnized

Marriages in Alaska are void unless properly solemnized. A.S. 25.05.311. Some of the requirements for properly solemnizing a marriage are described in A.S. 25.05.301, which provides in part:

> In the solemnization of marriage no particular form is required *except that the parties shall assent or declare in the presence of each other*

> *and the person solemnizing the marriage and in the presence of at least two competent witnesses that they take each other to be husband and wife.*

At the time of the alleged marriage ceremony, Wade was incarcerated at the Anchorage Jail.  Thus, he was not in the presence of Lisa Andrews, the witnesses, or the commissioner.

Proxy marriages, putative marriages where one party is not present and is represented by another, are against public policy and therefore void.  See In the Estate of Sidney Burger, 12 Quinn. Prob. Law Jour. 283.  (See also State of Alaska, Bureau of Vital Statistics web page, "**Marriage by Proxy:** *Proxy marriages (where someone stands in for the other party) are not permitted in Alaska.  The two parties must be present before the two witnesses and the officiant in order for the ceremony to be* performed.) (http://www.hss.state.a k.us/dph/bvs/ marriagel/default.htm).

The reasons why proxy marriages are illegal is obvious: the absence of one of the parties significantly impairs the ability of the person solemnizing the marriage to perform his or her duty under A.S. 25.05.271 to verify the true identities of the parties.[6]  Indeed, allowing a solemnization of marriage to occur

---

[6] In other state statutes similar to Alaska's statute, i.e., requiring "presence" of the parties, courts have indicated that this means the physical presence of both parties in the marriage

without actual presence also frustrates the state law requirement of two witnesses

under A.S. 25.05.311.  A witness's function is to verify that the ceremony took

place between the parties identified, to confirm that each party had the intent of

entering the marriage, and to report this information to the State of Alaska.  This

serves the important state function of preventing marriage fraud.  Here, Wade

acted so as to prevent the State's safeguards against fraudulent marriages from

being effective.

The marriage must meet state requirements in order as a prerequisite to any

invocation of spousal privileges.  By analogy, courts and several states have

commonly refused to recognize common law marriages as a basis for a valid

---

ceremony is essential to a valid marriage. Both bride and groom must be physically present at the time of the marriage ceremony. Overton v. Overton, 132 S.E.2d 349 (N.C. 1963).  Specifically, "the personal presence of both the bride and groom at the marriage rites is essential to a proper solemnization of the marriage, so that a marriage by proxy is invalid as a ceremonial marriage." Id. at 144.

Similarly, all marriages not solemnized or contracted in the presence of an authorized person or society are absolutely void.  Robinson v. Redd's Adm'r, 43 S.W. 435 (Ky. App. 1897).

Physical presence is an implicit requirement to the performance of a marriage.  Hames v. Hames, 316 A.2d 379 (Conn. 1972).

In this case, because Wade was not physically present during the time of his ceremony, the marriage is void for noncompliance with the statutory requirements for valid solemnization.

marriage.  See Overton v. Overton, 132 S.E.2d 349 (N.C. 1963) (Both bride and groom must be physically present at the time of the marriage ceremony); Hames v. Hames, 316 A.2d 379 (Conn. 1972) (Physical presence is an implicit requirement to the performance of marriage). Furthermore, the states of Delaware, Idaho, and Arizona have similar language to Alaska's statute.  See A.R.S. § 25-125, ( A. A valid marriage is contracted by a male person and a female person with a proper marriage license who participate in a ceremony conducted by and in the presence of a person who is authorized to solemnize the marriages and at which at least two witnesses who are at least eighteen years of age participate.); Idaho I.C. § 32-304, (No particular form for the ceremony of marriage is required, but the parties must declare, in a presence of the person solemnizing the marriage that they take each other as husband and wife); and Delaware I.C. § 32-304, (Delaware I.C. § 106(a)(2): Marriages shall be solemnized in the presence of at least 2 reputable witnesses who shall sign the certificate of marriage as prescribed by this chapter.)

Based on the above, the alleged marriage between Andrews and Wade is insufficient to invoke either the spousal or marriage communication privilege.

The reasons for his ruling are further supported by the evidence that Wade's telephonic marriage from prison was enacted to circumvent DOC regulations and procedures that would have precluded the wedding.

**D.    Given His Special Status as a DOC Inmate, Wade Failed to Obtain and Execute the Appropriate Paperwork and Failed to Obtain DOC Commissioner Approval Prior to the Marriage Ceremony**

While it is well-settled that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), it is equally well-settled that, "while persons imprisoned ... enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the ... loss of many significant rights." Hudson v. Palmer, 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The right to marry is one of those rights curtailed.  In Butler v. Wilson, 415 U.S. 953, 94 S.Ct. 1479 (1974), the Supreme Court affirmed a decision of a lower court which found that prisoners could be denied the right to enter the legal institution of marriage.  The reasoning endorsed by the Court was that since "the fact of their incarceration" had made it impossible for prisoners to engage in those aspects of marriage, "sexual intercourse, and the begetting and raising of children," that make marriage a fundamental right, the state's rational reasons for denying them

the legal status of marriage were sufficient.  <u>Johnson v. Rockefeller</u>, 365 F. Supp

377, 380 (D.C.N.Y. 1973).  Prisoners like Wade retain only those rights "not

inconsistent with [their] status as ... prisoner[s] or with the legitimate penalogical

objectives of the corrections system."  <u>Hudson</u>, 468 U.S. at 523, 104 S.Ct. 3194

(quoting <u>Pell</u>, 417 U.S. at 822, 94 S.Ct. 2800) (alterations in original).

      In Alaska, the legislature has seen fit to subordinate inmate marriage rights

to the discretion of the Commissioner of the Department of Corrections.  Alaska

Statute 44.28.030 vests authority in the Commissioner of the Department of

Corrections to "*adopt regulations to carry out or assist in carrying out the powers*

*and duties of the department.*"  Pursuant to that grant of authority, the State of

Alaska Department of Corrections (DOC) has developed prisoner marriage

applications and procedures.  Under Index # 808.10 (attached as Exhibit 10) a

prisoner subject to the jurisdiction of the State DOC must comply and complete a

number of  procedural steps before he or she is permitted to validly marry.

Conforming with this policy is a requirement of law for any person who is under

the jurisdiction of the State DOC.  According to A.S. 25.05.09, "Before the

issuance of the license, each contracting party shall make a statement under oath

that the contemplated marriage meets the requirements of law."  Wade's marriage

(and ceremony) failed to obtain DOC approval; nor did he comply with any of the DOC's procedures.

The first DOC procedure Wade failed to comply with concerns the provision of a marriage application to DOC.  (See Exhibit 11, certification of non-existence of any marriage related records from the Department of Corrections).  Upon submission, a DOC institutional probation officer conducts a review in order to verify the information, counsel the inmate and his spouse jointly on two separate occasions, and, among other things, determine based on information and belief that there are no legal or administrative impediments.  In this case, neither Wade nor Andrews went through these procedures.  In the ordinary course, and after completing this review, an evaluation of the proposal would move up the chain toward the facility Superintendent.

Upon review by the Superintendent, the proposal then travels to the level of Deputy Commissioner for ultimate review and ruling.  (See Exhibit 10, ¶A-C).  If the application is granted, provision is made for coordinating with the State Chaplaincy for arrangement of an in-custody ceremony.

Wade did not observe any of these procedures before his putative marriage to Andrews.  Wade had Andrews evade the regulations by obtaining a marriage

license from the Alaska Bureau of Vital Statistics without DOC permission, and then conducting a ten-minute long, invalid  marriage over the telephone.  Since Wade had not received permission of the DOC that the law required him to obtain, he could not properly "make a statement under oath that the contemplated marriage meets the requirements of law" as required by A.S. 25.05.09.

Clearly, Wade sought to evade DOC requirements as he knew the United States objected to his proposal to marry Andrews, a possible witness.  This variant of a proxy marriage, a type of ceremony that is likely to produce fraudulent marriages, is against public order and state law.  Accordingly, any spousal privilege or spousal communication/testimonial privilege objection to Lisa Andrews testifying at trail should be overruled.

III.    THE FRAUDULENT NATURE OF THE MARRIAGE OBVIATES USE
        OF ANY SPOUSAL/MARITAL PRIVILEGE AT TRIAL

Fraudulent intent in entering into a marriage nullifies the application of both spousal trial privileges.  In the case of <u>Lutwak v. U.S</u>, 344 U.S. 604, 614 (1953), the Supreme Court established that when a marriage is "entered into [...] only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other."  A marriage obtained in order to gain the benefit of spousal privilege is such a fraud.  <u>See In re Grand Jury</u>

Proceedings (86-2), 640 F. Supp. 988, 990 (E.D. Mich. 1986).  While <u>Lutwak</u> and the cases that followed it dealt with the testimonial privilege of spouses, the Court's original reasoning that there was no need to "protect the sanctity and tranquility of the marital relationship" in fraudulent marriages indicates that the decision is of equal application to both the spousal testimonial privilege and the confidential communication privilege.  Each privilege is discussed in turn.

### A.    Spousal Testimonial Privilege

Under Fed.R.Evid. 501, the nature and scope of both the spousal testimonial privilege, sometimes called the "anti-marital facts" privilege, and the marital communications privilege are determined by federal common law.  <u>United States v. Marashi</u>, 913 F.2d 724, 729 (9th Cir. 1990).  The privilege against adverse spousal testimony provides that an individual "may be neither compelled to testify nor foreclosed from testifying" against the person to whom he or she is married at the time of trial.  <u>United States v. Espino</u>, 317 F.3d 788, 796 (8th Cir. 2003), <u>citing United States v. Bad Wound</u>, 203 F.3d 1072, 1075 (8th Cir. 2000) (<u>citing Trammel</u>, 445 U.S. 40, 53, 100 S.Ct. 906 (1980)).  The privilege, therefore, rests with the testifying spouse who may waive the privilege without consent of the

defendant spouse.  Id., also, Marashi, 913 F.2d at 729 citing United States v. Bolzer, 556 F.2d 948, 951 (9th Cir.1977).  See also United States v. Clark, 712 F.2d 299, 302 (7th Cir. 1983) (affirming general rule that privilege does not cover pre-marriage acts, courts can therefore avoid mini-trials on the issue of the sincerity of the parties at the time of marriage).  It follows, then, that if Andrews waives the privilege when called to testify, she could testify as a witness at trial. Conversely, if she asserts the privilege, the illegal nature of the marriage prevents application of the testimonial privilege.

### B.    Marital Communication Privilege

The marital communications privilege protects only words or acts that are intended to convey a message to the other spouse.  Marashi, 913 F.2d at 729-730. (Citations omitted).  Pereira v. United States, 347 U.S. 1, 6 (1954).  The spouse who made the communication can invoke the privilege, whether as the testifying spouse or the non-testifying spouse.  Marashi, 730.  This privilege applies only to those conversations which are confidential, though communications made in private are assumed to be in confidence and privileged.  Wolfe v. United States, 291 U.S. 7 (1934).  However, the privilege does not extend to statements which are made before third parties, or which are likely to be overheard.  Marashi, 913

F.2d at 730, <u>citing</u> <u>Pereira v. United States</u>, 347 U.S. 1, 6 (1954).[7]  Nor does the

privilege extend to pre-marriage acts.  <u>United States v. Pensinger</u>, 549 F.2d 1150,

1151 (8th Cir. 1977); <u>Volianitis v. Immigration and Naturalization Service</u>,

352 F.2d 766, 768 (9th Cir. 1985).

Not extending the confidential communications privilege to fraudulent

marriages is also consistent with the reasons the Ninth Circuit gave in <u>Marashi</u>

where the court found the communications privilege inapplicable to statements

made in furtherance of joint criminal activity between spouses.  <u>See</u> <u>Marashi</u>,

913 F.3d at 730-731.  In making this determination, the Ninth Circuit quoted a

Second Circuit opinion, <u>United States v. Estes</u>, as summarizing the prevailing

view of what is now known as the "partnership in crime exception":

> The [circuits] which recognize that "partnership in crime" exception
> to the confidential communication privilege believe that greater
> public good will result from permitting the spouse of an accused to
> testify willingly concerning their joint criminal activities than would
> have come from permitting the accused to erect a roadblock against
> the search for truth.

---

[7]Alaska Evidence Rule 505(b) provides for a general marital communication privilege for confidential communications  made by one spouse to the other during the course of the marriage, without the consent of the other spouse.  An exception exists, however, as there is no privilege under this section for communications made if they concern communications made about a crime made prior to the marriage, or, if the communication was made in whole or in part to enable or aid anyone to commit or plan to commit a crime or fraud.  (<u>See</u> ER 505(a)(2)(D)(iv) and 505 (b)(1)(2)(A) and (B)).

Marashi, 913 F.2d at 730.  Likewise, a greater public good results from not applying the marital privilege to fraudulent marriages.  To use the language of the Ninth Circuit in Marashi, "the policies underlying the marital communications privilege pale in the face of public concerns about bringing criminals to justice. Ibid. (citations omitted).

Though Wade will most likely deny that the purpose of the marriage was to obtain the benefit of spousal privileges, the putative marriage between Andrews and Wade was a fraud of the kind described in Lutwak.  In the time leading up to the putative marriage, the relationship between the parties was conducted almost entirely through monitored telephone conversations.  In these conversations, Wade and Andrews accused each other of infidelity and applied curse words to each other on a regular basis.  Neither Andrews nor Wade, who is twenty years his putative wife's junior, is any stranger to the criminal justice system.  Andrews discussed fleeing the jurisdiction in order to avoid testifying.  The putative marriage was Wade's attempt to achieve the same result.  The government will establish that Wade put continual pressure on Andrews to not only get married, but to perform a marriage ceremony and complete the paperwork as quickly as possible.

IV.   WADE'S COMMUNICATIONS MADE WHILE INCARCERATED ARE
NOT PRIVILEGED

Wade's in-custody telephonic conversations with Andrews made since his

incarceration are not confidential and would not be subject to the marital

communications privilege even if the marriage was ruled valid.  It is well

established that the presence of a third party or reasonably anticipated

eavesdropper negates the presumption of privacy.  United States v. Montgomery,

384 F.3d 1050, 1056 (9th Cir. 2004), Pereira v. United States, 347 U.S. 1, 6

(1954).  Wade is no stranger to incarceration and knew that each call, whether

made from the Anchorage Jail or SeaTac, would be routinely recorded.  He knew

this due to the posting of messages at each facility stating that all inmate calls

were monitored/recorded and due to the fact that an electronic message warned

participants that the call would be recorded and subject to monitoring.

Such  routine monitoring and recording of inmate calls does not implicate

the Fourth Amendment of the U.S. Constitution.  United States v. Van Poyck,

77 F.3d 285 (9th Cir.1996).  In Van Poyck, the Ninth Circuit held that persons in

custody pending trial have no reasonable expectation of privacy in outbound calls

made from detention facilities.  Id. at 291.  The Van Poyck court stated:

Even if Van Poyck believed that his calls were private, no prisoner
should reasonably expect privacy in his outbound telephone calls.
Although prisoners do not forfeit all their privacy rights at the
jailhouse steps, Franklin v. Oregon, 662 F.2d 1337, 1347 (9th
Cir.1981) ( "[A] prisoner does not lose all rights to privacy."), they do
have those rights severely curtailed.  See, e.g.,  Hudson v. Palmer,
468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (finding that a
prisoner had no reasonable expectation of privacy in his prison cell);
Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384
(1962) (finding that prisoner had no reasonable expectation of
privacy in public jail visiting rooms);  United States v. Hitchcock,
467 F.2d 1107 (9th Cir.1972), cert. denied, 410 U.S. 916, 93 S.Ct.
973, 35 L.Ed.2d 279 (1973) (finding that prisoner had no reasonable
expectation of privacy in his cell).  The extent of curtailment for
pretrial detainees is the same as for convicted inmates.  Bell v.
Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447
(1979).

See also United States v. Hearst, 563 F.2d 1331 (9th Cir.1977), cert. denied,

435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), holding that any expectation

of privacy in outbound calls from prison is not objectively reasonable and that the

Fourth Amendment is therefore not triggered by the routine taping of such calls.

Given the foregoing, the government should be permitted to review and use

at trial all calls made by Wade to Lisa Andrews made after their purported

marriage.

//

//

## VI.   CONCLUSION

Based on the above, the government respectfully requests the court to rule that the telephonic ceremony between Andrews and Wade is insufficient under federal law to invoke the spousal or marital communications privilege at trial and that Lisa Andrews be permitted to testify at trial concerning all admissions made by the defendant irrespective of whether they occurred before or after the marriage.

RESPECTFULLY SUBMITTED this 9th day of July, 2009, at Anchorage, Alaska.

KAREN L. LOEFFLER
United States Attorney

s/Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3668
Fax: (907) 271-1500
E-mail: steven.skrocki@usdoj.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on July 9, 2009, electronically, via the CM/ECF system, on the following counsel of record. Additionally, the government will provide the following counsel of record, via Federal Express, the electronic exhibits filed conventionally with the Court.

Gilbert H. Levy
Suzanne Lee Elliot

s/Steven E. Skrocki
Assistant U.S. Attorney